UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

SOUTHERN RECYCLING, LLC, and, )    Civil Action No.: 7:13-CV-3125-BHH
CNA INSURANCE COMPANY LIMITED, )
                              )
                              )
                   Plaintiffs, )
                              )
         vs.                  )        __Opinion and Order__
                              )
GIBBS INTERNATIONAL, INC.,     )
                              )
                   Defendant. )
_____ )

This matter is before the Court on Plaintiffs' motion for partial summary judgment

(ECF No. 33) and Plaintiffs' motion to exclude Defendant's additional evidence (ECF

No. 62). For the reasons set forth in this Order, Plaintiffs' motion to exclude is denied

and Plaintiffs' motion for partial summary judgment is granted.

## BACKGROUND

This diversity action stems from an alleged breach of contract. On November 6,

2012, Plaintiff Southern Recycling, LLC ("Plaintiff Southern" or "Southern") contracted

with Defendant Gibbs International, Inc. ("Defendant" or "Gibbs") to purchase 500,000

pounds of scrap copper wire. (Contract, ECF No. 1-1.) The purchase contract contained

a delivery term stating:

> F.O.B., loaded in bulk into Buyer's 20' sea container at Port of Manila,
> Philippines. Shipments and delivery to be completed no later than
> November 30, 2012. Seller [sic] buyer and seller will mutually agree upon
> dates, location, and loading times for containers. Buyer will have a
> representative at each loading and will sign each trucker's bill of ladings
> [sic], along with Sellers [sic] representative.

(*Id.* at 2.) The payment term of the purchase contract stated:

> Payment to be made via wire transfer to Seller's designated banking account the following business day upon Buyer's inspection and acceptance of goods, and Seller's delivery as described above. Incremental payments will be made on each shipment.

(*Id.*)

Gibbs purchased the scrap copper wire it sold to Southern Recycling from a third party, Regent Phoenix Imports and Exports ("Regent Phoenix"). (Answer, ECF No. 5 at ¶ 10; Boozer Dep. 103:11-14, 109:1-8, ECF No. 33-6.) A total of thirteen (13) shipping containers, generally two (2) per day, were sent to an inland warehouse in Sucat, Philippines in order to load the copper wire. (ECF No. 5 at ¶ 12.) The containers were trucked from the warehouse in Sucat to the Port of Manila, transported by ocean carrier to Long Beach, California, and then transported to their final destination in Dallas, Texas. (Def. Resp. to Mot. Summ. J., ECF No. 47 at 6; Ford Dep. 62, ECF No. 47-6.) Plaintiffs allege that when the containers were opened in Dallas, they contained debris, e.g. cement blocks and slag, not copper wire. (Compl., ECF No. 1 at ¶ 17.) Although this allegation was denied for lack of sufficient knowledge in Gibbs' answer (ECF No. 5 at ¶ 17), later deposition testimony from Gibbs' Fed. R. Civ. P. 30(b)(6) witness appears not to contest that the copper wire was substituted for debris at some point during the shipping process (*see* Boozer Dep. 163:2-6, 165:6-19, ECF No. 49-2). Plaintiff CNA Insurance Company Limited ("Plaintiff CNA") is Plaintiff Southern's marine cargo insurer, and performed an investigation into the loss of the scrap copper wire. (Ford Dep. 17:17-25, ECF No. 47-6.)

Plaintiffs filed their motion for summary judgment on August 28, 2015. (ECF No. 33.) Defendant responded on October 30, 2015 (ECF No. 47), and Plaintiffs replied on December 15, 2015 (ECF No. 49). On March 21, 2016, Defendant filed the affidavit of

Woody Ezzell (ECF No. 60-1) as additional evidence in support of its response to the motion for partial summary judgment. Plaintiffs next filed a motion to exclude the affidavit (ECF No. 62) on March 24, 2016, and Defendant responded on March 28, 2016 (ECF No. 63). On March 29, 2016, the Court conducted a hearing on the motion for partial summary judgment and took the matter under advisement.

## STANDARD OF REVIEW

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

3

(1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252. Conclusory allegations or denials, without more, are likewise insufficient. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## DISCUSSION

### I. Motion for Partial Summary Judgment

Plaintiffs seek partial summary judgment on a discreet legal issue in this case. Specifically, Plaintiffs request that the Court find as a matter of law that, pursuant to the terms of the purchase agreement, Gibbs was obligated to deliver the copper wire in containers to the Port of Manila, Philippines and, if Gibbs failed to satisfy this obligation, Gibbs bore the risk of loss. (ECF Nos. 33 at 1 and 33-1 at 1, 4.) As set forth fully below, the Court agrees with Plaintiffs' position and grants summary judgment on this narrow legal issue.

The Court would first state some general principles regarding contract interpretation under South Carolina law, which the parties agree is controlling in this

case. An action to construe a contract is an action at law. *McGill v. Moore*, 672 S.E.2d 571, 574 (S.C. 2009) (citing *Pruitt v. South Carolina Med. Malpractice Liab. Joint Underwriting Ass'n.*, 540 S.E.2d 843, 845 (S.C. 2001)). The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language. *McGill*, 672 S.E.2d at 574 (citing *Schulmeyer v. State Farm Fire and Cas. Co.*, 579 S.E.2d 132, 134 (S.C. 2003)). The construction of a clear and unambiguous contract presents a question of law for the court. *S.C. Dep't of Transp. v. M&T Enters. of Mt. Pleasant, LLC*, 667 S.E.2d 7, 13 (S.C. Ct. App. 2008); *see also Pruitt*, 540 S.E.2d at 845. Courts must enforce, not write, contracts, and their language must be given its plain, ordinary and popular meaning. *Williams v. Gov't Emps. Ins. Co. (GEICO)*, 762 S.E.2d 705, 709-10 (S.C. 2014) (citing *Sloan Const. Co. v. Cent. Nat'l Ins. Co. of Omaha*, 236 S.E.2d 818, 819 (S.C. 1977)).

### A. The F.O.B. Term And Its Meaning Under the Commercial Code

Turning to the purchase contract at issue here, the "Delivery" term plainly states: "F.O.B., loaded in bulk into Buyer's 20' sea container *at Port of Manila, Philippines*." (ECF No. 1-1 at 2 (emphasis added).) Section 36-2-319 of the South Carolina Commercial Code, entitled "F.O.B. and F.A.S. terms," states in relevant part:

> (1) Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a *delivery term* under which
>
> > (a) when the term is F.O.B. the *place of shipment*, the seller must *at that place* ship the goods in the manner provided in this chapter (Section 36-2-504) and *bear the expense and risk of putting them into the possession of the carrier* . . . .

S.C. Code § 36-2-319 (emphasis added). The Official Comment section of the statute describes the general purpose of the F.O.B. provisions in the Commercial Code, stating:

"This section is intended to negate the uncommercial line of decision which treats an 'F.O.B.' term as 'merely a price term.'" S.C. Code Ann. § 36-2-319, cmt. 1. Moreover, the associated South Carolina Reporter's Comments state, "In addition to being a price term, the parties also use the term to indicate the point at which title passes and delivery takes place," and with respect to § 36-2-319(1)(a), "In addition to the allocation of payment of freight charges, the risk of loss during handling and shipment passes to the buyer at the F.O.B. point." S.C. Code Ann. § 36-2-319.

Against this backdrop of what the Court considers to be clear, unambiguous contractual language and fairly straightforward statutory application, Defendant makes numerous arguments regarding why, in its view, Plaintiffs have failed to establish, as a matter of law, that Gibbs bore the risk of loss prior to the Port of Manila. Defendant hangs the majority of its argument on a caveat built into § 36-2-319(1), which states: "*Unless otherwise agreed* the term F.O.B. . . . at a named place . . . is a delivery term . . . ." *Id.* (emphasis added). Citing *Williston on Contracts*, Gibbs argues that the statutory meaning of the term F.O.B. is subject to (1) any contrary agreement of the parties, (2) the parties' course of performance and course of dealing, and/or (3) usage of trade. (ECF no. 47 at 11 (citing 18 Williston on Contracts § 52:11 (4th ed.).)

Defendant first cites two cases to support its general argument that the F.O.B. term should glean its meaning from sources other than the statute; however, neither case effectively supports Defendant's position. In *Black Prince Distillery, Inc. v. Home Liquors*, 148 N.J. Super. 286 (N.J. Sup. 1977), a liquor distiller (seller) brought an action against a liquor retailer (buyer) to recover the cost of liquor ordered by the retailer but hijacked during delivery. *Id.* at 287. The retailer had been purchasing whisky from the

distiller for about twenty-five years. The retailer prepared the shipping documents which did not designate a destination for the goods. The retailer's telephone purchase order was confirmed by a writing executed by the retailer and directed to the distiller, entitled 'Request for Release,' and setting forth the quantity and type of goods being purchased. The writing contained no instructions as to where the goods were to be delivered. The trucking cost was either totally or partially paid by the distiller. Subsequently, the goods were allegedly hijacked while in the possession of the carrier en route to a destination designated by the retailer. *Id.* In evaluating who bore the risk of loss, the trial judge used a letter written after the alleged hijacking to infer that the parties' arrangement had always been such that the distiller was required to make delivery to the retailer's locations, and thus must bear the loss resulting from the theft. *Id.* at 288. The appellate court reversed, finding that the trial judge disregarded the course of dealings between the parties that had existed for many years, and holding that title passed when the distiller turned the goods over to the carrier, from which point the risk of loss was born by the retailer. *Id.* at 288-89.

The *Black Prince* case is wholly different from the instant case for any number of reasons, not the least of which are: (1) the parties in *Black Prince* had no written agreement indicating a point of delivery, (2) there was no F.O.B. term applicable to the transaction at issue, and (3) the parties in *Black Prince* had a twenty-five year course of dealings from which the court could discern their intentions. *Id.* Here, the purchase contract contained an unambiguous F.O.B. term specifying the point of delivery, and the parties had no dealings prior to the transaction in question. The Court need say no more, *Black Prince* does not support Gibbs' arguments.

*In re Julien Co.*, 128 B.R. 987 (Bankr. W.D. Tenn. 1991), *aff'd*, 44 F.3d 426 (6th Cir. 1995), involved an adversary proceeding brought to determine entitlement to proceeds from the sale of cotton, which had been delivered to the debtor (buyer) but not paid for. *Id.* at 990-92. The debtor (buyer), a cotton merchant, contracted to purchase cotton from a broker (seller). The bankrupt merchant failed to pay for 360 bales of cotton, and the cotton broker made a claim in the merchant's bankruptcy case to recover payments it was forced to make to its suppliers, which were cotton producers. The contract provided that the cotton would be transported "F.O.B. trucks at Oakland Gin Company, Oakland Alabama," the seller's gin. *Id.* at 990.

The *In re Julien* court applied the "unless otherwise agreed" language from the Uniform Commercial Code ("UCC")[1] in finding that the parties varied the meaning of the F.O.B. term supplied by the UCC. *Id.* at 996. There, the court found that the parties' true agreement was that "F.O.B. trucks at Oakland Gin" was to mean simply that the buyer would pay for the cost of shipment rather than that "delivery" or performance by the seller was completed by the loading of the trucks. *Id.* Importantly, the *In re Julien* court made this conclusion based on the parties' testimony and an *additional term* in the contract, styled "PLACE OF PERFORMANCE," which essentially provided that performance included the seller invoicing the cotton at a provisional price and drawing a draft on the buyer's bank with an accompanying bill of lading at the time the cotton was loaded. *Id.* at 995-96. Thus, the court held that "neither the seller's performance nor delivery was completed at the time the trucks were loaded. Rather, the seller's performance was completed upon delivery to The Julien Warehouse." *Id.* at 996.

---

[1] S.C. Code § 36-2-319 is identical to § 2-139 of the UCC, which is, in turn, mirrored in Tenn. Code § 47-2-319, at issue in *In re Julien*.

In the instant case, the purchase contract contains no additional term that expressly varies the meaning of the F.O.B. term, and the Court finds that none of the existing terms manifest the parties' intent to transfer the risk of loss prior to delivery or alter the statutory meaning of F.O.B. as a delivery term. The precise facts of *In re Julien*, seem to cut against, not in favor of, Defendant's argument, since the *In re Julien* court held that the seller's performance was not completed at loading, even though the F.O.B. term itemized seller's gin as the relevant location. Moreover, the features of the purchase contract in this case are meaningfully distinguishable from *In re Julien*, where the court held that the "PLACE OF PERFORMANCE" term was, in substance, the delivery term, and the "F.O.B. trucks at Oakland Gin" term merely indicated that the buyer was to pay for shipping. Here, the delivery term is clearly delineated, and performance of Gibbs' obligation under the contract was contingent upon the purchased copper being delivered *to the Port of Manila*. As will be discussed more thoroughly *infra*, the fact that the delivery term provided that, "Buyer will have a representative at each loading and will sign each trucker's bill of ladings [sic], along with Sellers [sic] representative," does not, in the Court's view, alter the statutory meaning of the F.O.B. term.

### B. The Agreement of the Parties and the Parties' Intent

First, Defendant argues that the meaning of "F.O.B. Port" in the purchase agreement should be varied from its statutory meaning because the agreement between the parties and their contractual intent establish that the risk of loss was meant to pass from Gibbs to Southern at the inland warehouse in Sucat. (ECF No. 47 at 13.) In support of this assertion, Defendant states that the "agreement between the parties"

means that the purchaser (Southern) must: "(1) inspect and accept the cargo at the inland warehouse in Sucat; (2) inspect and accept the loading of the containers at the inland warehouse in Sucat; (3) seal the containers at the inland warehouse in Sucat; [and] (4) re-inspect after traveling from Sucat to the inland warehouse in Manila." (*Id.*) In reviewing the purchase contract, the Court is unable to find all of these purported elements of the parties' agreement. (*See* ECF No. 1-1 at 2-3.) Rather, the delivery term requires that Southern have a representative at the loading to sign off on each bill of lading *along with Gibbs' representative*, and the payment term indicates that payment will be made the following business day upon Southern's "inspection and acceptance" of the goods, "*and Seller's delivery as described above.*" (*Id.* at 2 (emphasis added).) It seems abundantly clear to the Court that, under the explicit terms of the contract, "delivery" was not achieved until Gibbs' put the goods into the hands of the carrier at the Port of Manila.

The Court finds that, contrary to Defendant's assertions, nothing in the "inspection and acceptance" phrase of the payment term indicates that the parties expressly intended to transfer the risk of loss to Southern at the inland warehouse. Furthermore, to focus on that phrase narrowly is to ignore the remainder of the payment term which makes payment contingent upon Gibbs' fulfillment of its delivery obligations "as described above." This language makes it abundantly clear that the F.O.B. Port delivery described in the foregoing delivery term was a distinct contractual obligation, independent from the buyer's inspection and acceptance, an obligation uniquely born by Gibbs. By relying on the "inspection and acceptance" phrase and ignoring the phrase immediately following thereafter, Defendant's argument fails to interpret the purchase

contract as a whole. But holistic interpretation of the contract is the Court's duty. *See McGill v. Moore*, 672 S.E.2d 571, 574 (S.C. 2009) ("A contract is read as a whole document so that one may not create an ambiguity by pointing out a single sentence or clause.") The language of the purchase contract alone simply does not show an express intent by the parties to vary the statutory meaning of the F.O.B. Port delivery term.

One provision within the delivery term that both parties appear to have overlooked in their arguments reads, "*Shipments and delivery* to be completed no later than November 30, 2012." (*Id.* (emphasis added).) Thus, "shipments" of the copper are conceived as distinct from its eventual "delivery" to the F.O.B. location. The only rational construal of the word, "shipments," is that it denotes the transport from the location where the copper was to be loaded (inland warehouse) to the location where it was to be delivered (Port of Manila). This common sense reading of the delivery term is at odds with Gibbs' assertion that its obligations, and associated risk of loss, were satisfied at the time the containers were loaded, and it is undisputed that Gibbs paid for the transport from the inland warehouse to the Port.

Defendant highlights that Southern's inspection agent, Mr. Joel Dignos, (1) was present at the inland warehouse when all of the copper was loaded, (2) saw the copper in person, (3) verified that all of the copper was present on the chart he inspected, (4) determined the copper he saw was in acceptable condition, and (5) watched the loading, sealed the containers himself, and took photographs. (ECF No. 47 at 7; Dignos Dep. 83-84, ECF No. 47-5.) But these facts do not advance Defendant any closer to nullifying an explicit, unambiguous term within the purchase contract that dictated delivery was achieved when the seller put the copper into the hands of the carrier at the

Port of Manila. Rather, Mr. Dignos' actions are indicative that Southern upheld its end of the bargain during the loading phase. It is natural that these steps were taken by Southern's agent during the time period when and at the place where it made most sense to observe the quality, quantity, and condition of the copper—loading at the inland warehouse. It does not follow that merely because Southern, through its agent, availed itself of this opportunity to inspect the copper it was buying, that risk of loss passed to Southern at that point. This is a non sequitur.

Defendant further asserts, "If [Southern] truly was not accepting the risk of loss at the inland warehouse in Sucat, all it need say was: '[Southern] does not accept the risk of loss at the inland warehouse in Sucat,'" and asks the rhetorical question, "If that was truly [Southern's] intent, why not include those fourteen words?" (ECF No. 47 at 13-14.) But this argument sets up a straw man. In the Court's view, Southern communicated the precise concept that it did not accept the risk of loss prior to the Port when it negotiated the inclusion of the F.O.B. Port term within the purchase contract. Pointing to the absence of hypothetical language does not call into question the force and application of the existing contractual language.

Gibbs advances the deposition testimony of its 30(b)(6) witness, Mr. Greg Boozer, as support for the notion that Gibbs' contractual intent was that risk of loss would pass at the inland warehouse. Mr. Boozer testified:

> Q: At what point under the purchase contract, Gibbs Exhibit 22, does Gibbs believe the risk of loss for the copper wire passed from Gibbs to Southern Recycling?
> . . .
> A: When the goods were loaded on the container and accepted by Southern Recycling.

(ECF No. 47-9 at 3-4.) However, as already explained, the construction of clear and

unambiguous contractual language is a question of a law for the Court. Mr. Gibbs'
testimony, while certainly serving of his company's interests, amounts to little more than
a *post hoc* legal conclusion about the meaning of the contract. The same goes for the
deposition testimony of Mr. Blair Biggerstaff, a former employee of Gibbs, who signed
the purchase contract on Gibbs' behalf. Defendant quotes Mr. Biggerstaff's testimony at
length, but fails to introduce information that would call the Court's conclusions on this
*matter of law* into question. (*See* ECF No. 47 at 14-15; Biggerstaff Dep. 147-150, ECF
No. 47-8.)[2]

### C. Course of Performance and Course of Dealing

Second, Defendant argues that independent of the terms of the purchase
contract, the parties' course of performance and course of dealing establish that the risk
of loss passed to Southern at the inland warehouse in Sucat. (ECF No. 47 at 15.) By
"course of performance" and "course of dealing," Defendant refers to the undisputed
facts that an agent of Southern inspected and accepted the cargo at the inland
warehouse, observed the loading of the cargo, sealed the containers himself, monitored
the transportation to the port by keeping track of departure and arrival times, and re-
inspected the containers just outside the Port. (*Id.*; Dignos Dep. at 78, 83-85, ECF No.
47-5; Boudreaux Dep. 43, ECF No. 47-2.) These circumstances, asserts Defendant,
show the passing of the risk of loss at the inland warehouse.

Put simply, Defendant has not established that the parties' course of
performance modified the statutory meaning of the F.O.B. term because there is no

---

[2] In truth, Mr. Biggerstaff's testimony is not nearly as one-sided on the risk of loss issue as Gibbs
represents. Upon being asked the following leading question, "You understood that the risk of loss
passed to Southern Recycling at the inland warehouse; is that right?" Mr. Biggerstaff responded, "That
was part of the discussion that we had, whereby—*I don't think there was any question that, at the latest, it
took place on delivery at the port.*" (Biggerstaff Dep. 147-48, ECF No. 47-8.)

course of performance at issue in this case. Section 36-1-303(a) of the South Carolina Commercial Code states:

> (a) A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:
>
>> (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
>>
>> (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

S.C. Code § 36-1-303(a). There is no "course of performance" here because there is no "sequence of conduct" that involves "repeated occasions for performance." The purchase agreement at issue involves a single transaction between Southern and Gibbs, and it is undisputed that this transaction was the first and last time these companies had commercial dealings. Thus, Defendant has not presented evidence of a "course of performance" for the Court to consider. Moreover, many of the actions by Southern's inspection agent that Gibbs relies upon as evidence that the parties modified the F.O.B. term through their "course of performance" were simply contractual obligations, laid out in the delivery and payment terms, that Southern needed to fulfill to keep its part of the bargain (e.g. inspecting the copper at the inland warehouse, observing the loading and accepting the goods, signing the bills of lading). The Court need say no more, there is no evidence that the parties modified the F.O.B. term through a course of performance.

Similarly, Defendant has not established that the parties' course of dealing modified the statutory meaning of the F.O.B. term because there is no course of dealing between the parties. Section 36-1-303(b) of the South Carolina Commercial Code

states: "A 'course of dealing' is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." S.C. Code § 36-1-303(b). Defendant has not presented any evidence regarding previous transactions between the parties, and, again, cannot do so because the transaction at issue is the only commercial dealing the parties ever had. Given this undisputed fact, there is no "course of dealing" for the Court to consider.

### D. Usage of Trade

Third, Defendant argues that the usage of trade establishes that the risk of loss passed to Southern at the inland warehouse in Sucat. In its response brief, Gibbs asserts, "The 'usage of trade' by inspecting and approving the cargo, the loading and sealing the containers itself with its own seals and the subsequent monitoring of the transportation of the cargo along with the re-inspection just outside the Port establish that the risk of loss passed to [Southern]." (ECF No. 47 at 15.) Defendant's assertions on this point are little more than a rehash of arguments already made with respect to the intent of the parties, course of performance, and course of dealing, and are likewise insufficient to establish a usage of trade.

By way of an affidavit styled as "Expert Designation Report of Norwood ("Woody") Ezzell" (ECF No. 60-1), submitted five months after its response in opposition to Plaintiff's motion for partial summary judgment, Defendant sought to remedy the dearth of evidence regarding usage of trade in its original submission.[3] The substance of Mr. Ezzell's affidavit is contained on one page and states in relevant part that he is

---

[3] The Court has duly considered Plaintiffs' motion to exclude this additional evidence, and as explained in section II. *infra*, chosen to consider it, giving it the weight to which it is entitled.

the owner of a freight forwarding business, he has been in that business since 1992, and "The usage of trade in the industry is that the risk of loss passes upon inspection and acceptance of the cargo, loading and sealing of the containers. That is particularly true when theft is known in the area." (*Id.* at ¶ 2, 6.) Mr. Ezzell does not offer any support for this proposition other than his employment, and his own "experience and expertise." (*See id.* at ¶ 2, 3.)

Prior to offering this opinion about the "usage of trade in the industry," Mr. Ezzel indicates that he has reviewed the purchase contract between Gibbs and Southern as well as some of the pleadings in the case. He states: "Based on my experience and expertise in the area of shipping and transporting cargo internationally, it is my interpretation that the risk of loss passed to the purchaser when they first inspected and accepted the cargo." (*Id.* at ¶ 4.) Mr. Ezzel then opines that based on the fact that Southern's agent inspected and accepted the cargo, observed the loading of the containers, and sealed the containers himself, "the purchaser accepted the risk of loss by engaging in these activities in an inland warehouse in the Philippines." (*Id.* at ¶ 5.) Mr. Ezzell's opinions, and the particular facts on which he bases those opinions, are unmistakably linked, both in their basis and in their resultant conclusions, to Gibbs' arguments that the F.O.B. term's statutory meaning has been modified by the parties' "course of performance," "course of dealing," and/or usage of trade. (*Compare id.* at ¶¶ 4-6, *to* ECF No. 47 at 15.) Notably, Mr. Ezzell's affidavit says nothing about F.O.B. terms, or how the purported usage of trade interacts with such F.O.B. terms when they are present in a purchase contract such as this one.

The Court finds that Mr. Ezzell's affidavit, though tendered as evidence of a

usage of trade to bolster Defendant's position that the statutory meaning of the F.O.B. term was modified, is insufficient to preclude the entrance of summary judgment on the risk of loss issue. Section 36-1-303 of the South Carolina Commercial Code states:

> (c) A "usage of trade" is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage must be proved as facts. If it is established that such a usage is embodied in a trade code or similar record, the interpretation of the record is a question of law.

S.C. Code § 36-1-303(c). To begin with, Mr. Ezzell's proffer about *when* the risk of loss passes from seller to buyer in the international shipping industry is a legal conclusion couched in thinly veiled factual terms as a "usage of trade." Nevertheless, assuming *arguendo* that usage of trade were a question of fact relevant to construction of the instant purchase contract, it is questionable whether Mr. Ezzell's affidavit construes "usage of trade" in a manner narrow enough to be helpful to a trier of fact on the putative question of whether risk of loss transferred prior to the Port of Manila. He opines with sweeping scope, "The usage of trade *in the industry* is that the risk of loss passes upon inspection and acceptance of the cargo, loading and sealing of the containers."[4] (ECF No. 60-1 at ¶ 6 (emphasis added).)

In general, extrinsic evidence may not be considered to ascertain the meaning of an unambiguous contractual term. *See Volvo Constr. Equip N. Am., Inc. v. CLM Equipment Co.*, 386 F.3d 581, 595-99 (4th Cir. 2004) (holding that under South Carolina law, parol evidence rule barred defendants from using extrinsic evidence to modify or

---

[4] Numerous questions arise from Mr. Ezzell's stated conclusion. To what industry is he specifically referring, international cargo shipping generally? Under what circumstances does this usage of trade apply? Does the opinion indicate that in every instance where an international shipping container is inspected, the cargo accepted, the cargo loaded, and the container sealed, that risk of loss passes to the buyer at that point? Does this usage of trade apply irrespective of contractual terms to the contrary? Is it empirically based? The Court need not answer the questions raised by the affidavit, however, to find that its presence in the record does not preclude summary judgment.

contradict terms of agreements, because agreements were detailed and explicit). "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." *Beaufort Cty. Sch. Dist. v. United Nat. Ins. Co.*, 709 S.E.2d 85, 90 (S.C. Ct. App. 2011). "A contract is ambiguous only when it may fairly and reasonably be understood in more ways than one." *Padgett v. S.C. Ins. Reserve Fund*, 531 S.E.2d 305, 307 (S.C. Ct. App. 2000). "It is a question of law for the court whether the language of a contract is ambiguous. Once the court decides the language is ambiguous, evidence may be admitted to show the intent of the parties. The determination of the parties' intent is then a question of fact." *S.C. Dep't of Nat. Res. v. Town of McClellanville*, 550 S.E.2d 299, 302-03 (S.C. 2001) (internal citations omitted); *see also Wallace v. Day*, 700 S.E.2d 446, 449 (S.C. Ct. App. 2010).

However, as Defendant correctly argues (*see* ECF No. 47 at 16-17), in cases under the UCC, a finding of ambiguity in the contractual language is not required before extrinsic evidence concerning the meaning of the contract, including usage of trade, may be considered. *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 9 (4th Cir. 1971) ("We hold . . . that a finding of ambiguity is not necessary for the admission of extrinsic evidence about the usage of the trade and the parties' course of dealing."). Nevertheless, usage of trade does not simply trump unambiguous contractual terms, for "[t]here can be no doubt that the [UCC] restates the well established rule that evidence of usage of trade and course of dealing should be excluded whenever it cannot be reasonably construed as consistent with the terms of the contract." *Id.* (citing *Div. of Triple T Serv., Inc. v. Mobil Oil Corp.*, 304 N.Y.S.2d 191, 203 (1969), *aff'd mem.*, 311

N.Y.S.2d 961 (N.Y. 1970)). Still, evidence of usage of trade to explain or supplement terms should not be excluded simply because a contract appears to be complete. *Id.* Rather, "the test of admissibility is not whether the contract appears on its face to be complete in every detail, but whether the proffered evidence of course of dealing and trade usage reasonably can be construed as consistent with the express terms of the agreement." *Id.*

Applied to the instant case, the Court finds that the usage of trade proffered by Mr. Ezzell, to the extent it constitutes more than a bare legal conclusion, cannot be reasonably construed as consistent with the express terms of the purchase agreement, and is therefore not admissible to preclude the entry of summary judgment. *See Columbia Nitrogen Corp.*, 451 F.2d at 9; *see also Volvo Const. Equip.*, 386 F.3d at 599 (holding that "[t]he terms of the Dealer Agreements are clear and unambiguous, and we must decline to modify them on the basis of either course of dealing *or industry custom*" (emphasis added)). Specifically, Mr. Ezzell's proffer of the usage of trade regarding transfer of the risk of loss cannot be reasonably reconciled with the delivery term, "F.O.B., loaded in bulk into Buyer's 20' sea container at Port of Manila, Philippines," because it flatly contradicts that term on the central issue, namely, *when* the risk of loss passes. Thus, to the extent the affidavit raises an issue of material fact regarding usage of trade, the issue is not *genuine* because it would not permit a reasonable jury to return a verdict for Defendant based on the proffered evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The remaining opinions in Mr. Ezzell's affidavit unquestionably constitute legal conclusions, not facts or permissible expert opinions, and are insufficient to withstand summary judgment on the risk of loss issue. (*See* ECF

No. 60-1 at ¶¶ 4-5.)

### E. Questions of Fact

Fourth, Defendant argues that at a minimum, the intentions of the parties, course of dealing, and/or usage of trade as to the timing of the passing of the risk of loss involve issues of fact to be resolved at trial. Citing *Wallace v. Day*, 700 S.E.2d 446, 449 (S.C. Ct. App. 2010) for the rule that when a contract is ambiguous the parties' intent becomes a question of fact, Defendant asserts that this rule has been applied to deny summary judgment in the context of determining the time at which  risk of loss passed. (ECF No. 47 at 16.) Here, Defendant relies on a ruling from the District Court of Appeal of Florida, *Ladex Corp. v. Transportes Aeros Nacionales, S.A.*, 476 So.2d 763 (Fla. App. 1985). In *Ladex*, the court was unable, due to an undeveloped record, to determine as a matter of law who had title to the goods at the time of loss. *Id.* at 766. The *Ladex* court found that factual issues remained as to the type of contract that existed between the parties, reversed the trial court's grant of summary judgment, and remanded for further proceedings accordingly. *Id.*

No such problem exists in the instant case. The record is amply clear about the type of contract at issue, as well as the various facts and circumstances that might conceivably operate to alter the statutory meaning of the F.O.B. term. Additionally, Gibbs' 30(b)(6) witness acknowledged his belief that title did not pass until the copper was delivered to the Port. (Boozer Dep. 110:11-15, ECF No. 33-6.) Put simply, Gibbs has not produced evidence of any genuine issue of material fact on the risk of loss issue, and the Court finds that summary judgment is appropriate.

### F. Waiver and Estoppel

Fifth, Defendant argues that Southern waived, and/or is estopped from asserting that it did not accept the risk of loss until the copper arrived at the Port. Specifically, Gibbs asserts that Southern's activities, through its agent, in inspecting and accepting the cargo, inspecting the containers, observing the loading, monitoring the departure and arrival of the transport, as well as the "failure" to re-open the container doors just outside the Port or on the Port property, and the "failure" to utilitze an x-ray machine to ensure the cargo was still inside the containers, all constitute waiver and/or estoppel regarding Southern's argument that the risk of loss did not transfer. (ECF No. 47 at 18-19.) The Court disagrees.

Waiver is a "voluntary and intentional abandonment or relinquishment of a known right." *Sanford v. S.C. State Ethics Comm'n*, 685 S.E.2d 600, 607 (S.C. 2009). "Often confused with waiver, equitable estoppel focuses on a party's detrimental reliance on another party's conduct while waiver analysis focuses on a party's unequivocal intent to relinquish a known right." *Strickland v. Strickland*, 650 S.E.2d 465, 471 (S.C. 2007). "Equitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Am. Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006).

Defendant has not presented any facts to demonstrate that Southern voluntarily and intentionally abandoned or relinquished the right to assert that risk of loss transferred to Southern only when Gibbs delivered the copper wire in containers to the Port. Neither has Gibbs presented facts to demonstrate that it relied on the inspections performed by Southern, or any other conduct by Southern, to its detriment. Ironically, at least some of the inspection activity that Gibbs asserts as the basis for its waiver and

estoppel theories was activity that Southern had a contractual duty to perform. (*See* ECF No. 1-1 at 2.) Gibbs had a parallel contractual duty to have a representative present at each loading and sign off on each bill of lading, further undermining Gibbs' waiver and estoppel arguments. (*Id.*) Moreover, waiver and estoppel are affirmative defenses that Gibbs "must affirmatively state" in its answer, Fed. R. Civ. P. 8(c)(1), which Gibbs did not do (*see* ECF No. 5).[5] Defendant's assertions of waiver and estoppel are not effective to prevent the entrance of summary judgment in this case.

### G. The Duty to Avoid Damages

Sixth, Defendant argues that, according to certain admissions made by Southern's inspection agent and by Mr. Royston Ford, an investigator hired by Plaintiff CNA, Southern could have avoided all of its damages, and consequently is not entitled to any recovery. (ECF No. 47 at 19-23.) Accordingly, argues Gibbs, the motion for partial summary judgment should be denied. The Court would say very little on this issue. The issue of damages was not raised by the motion for partial summary judgment, and is not before the Court at this time. Defendant cites no authority for the proposition that Southern's failure to mitigate certain damages, or avoid them altogether, precludes the entry of summary judgment on the discreet issue raised in Plaintiffs' motion.

### H. Request to Dismiss Motion Under Rule 56(d)

Finally, Defendant argues that the motion for partial summary judgment should be dismissed as premature under Fed. R. Civ. P. 56(d) because, at the time it was required to respond, Gibbs had not yet had the opportunity to complete the discovery

---

[5] Subsequent to Plaintiffs pointing out Defendant's failure to include waiver and estoppel as affirmative defenses in its answer (*see* ECF No. 49 at 15), Defendant filed a motion to amend its answer (ECF No. 59) correcting the issue. That motion is still pending before the Court.

necessary to support its opposition to the motion. (*Id.* at 23.) In support of this request, Gibbs represented a list of fourteen individuals that it "need[ed] to depose" because they were "the remaining witnesses that Plaintiffs are going to call to testify at trial." (*Id.*) In reality, the individuals Gibbs listed were merely persons that Plaintiffs identified in their Rule 26(a)(1) disclosures. (ECF No. 49 at 16.) In making its request that the motion be dismissed on 56(d) grounds, Gibbs did not describe or identify the information it needed, or explain what helpful or necessary information any of the fourteen individuals may have, which would assist Gibbs in responding to the motion for partial summary judgment. Furthermore, according to Plaintiffs, Gibbs had not noticed the deposition of any of the fourteen listed individuals one and a half months after it filed its response. (ECF No. 49 at 17.) Having been presented with no credible reason why the discovery record was insufficient for Defendant to respond to the narrow question presented in Plaintiffs' motion, the Court hereby declines Defendant's request to dismiss the motion under Rule 56(d).

## II. Motion to Exclude Additional Evidence

Shortly after Defendant filed the affidavit of Woody Ezzell, described above, as additional support for Defendant's opposition to Plaintiffs' motion, Plaintiffs filed a motion to exclude the additional evidence. (ECF No. 62.) Plaintiffs argued that: (1) Gibbs' last-minute submission of the affidavit violated Local Civil Rule 7:06 which requires that responses be filed within fourteen days unless the court imposes a different deadline; (2) the subject affidavit is insufficient because it does not identify the field in which Mr. Ezzell is proffered as an expert, nothing about Mr. Ezzell's experience suggests that he has specialized knowledge regarding the transfer of risk of loss at

issue in this case, and the self-serving affidavit advances a conclusory opinion seemingly designed to create an issue of fact without any support; and (3) contrary to Gibbs' assertions in its covering document, Plaintiffs' motion for partial summary judgment was not premature.

Gibbs responded to the motion to exclude (ECF No. 63), arguing: (1) Plaintiffs' premature filing of its Rule 56 motion did not deprive Gibbs of its right to develop the record, and any impediment to Plaintiffs' ability to rebut Mr. Ezzell's affidavit is of Plaintiffs' own making; (2) Plaintiffs first mentioned usage of trade in their reply brief, further justifying the timing of Gibbs' expert affidavit; (3) Gibbs properly identified Mr. Ezzell in its expert disclosure (ECF No. 56) as an expert in the fields of "cargo transportation and contractual provisions concerning that transportation and knowledge and experience in international logistics;" and (4) the cases cited by Plaintiffs in attacking the validity of Mr. Ezzell's affidavit either support Gibbs' position or are distinguishable.

The Court has reviewed the parties' submissions on the motion to exclude and finds that Mr. Ezzell's affidavit is appropriate for the Court's consideration in ruling on Plaintiffs' motion for partial summary judgment. Thus, as already indicated, the Court denies Plaintiff's motion to exclude the additional evidence, and has taken the evidence under advisement.

## CONCLUSION

After careful consideration of the parties' briefs, the associated record, and the oral arguments presented at the March 29, 2016 hearing, the Court hereby GRANTS Plaintiffs' motion for partial summary judgment (ECF No. 33) and DENIES Plaintiffs'

motion to exclude Defendant's additional evidence (ECF No. 62). Thus, the Court finds, as a matter of law, that pursuant to the terms of the purchase contract, Gibbs was obligated to deliver the copper wire in containers to the Port of Manila, Philippines and, if Gibbs failed to satisfy this obligation, Gibbs bore the risk of loss.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

March 31, 2016
Greenville, South Carolina